# United States Court of Federal Claims

No. 18-357 L
November 4, 2019

_____

**UTE INDIAN TRIBE OF THE UINTAH
AND OURAY INDIAN RESERVATION,**

                    *Plaintiff*,

**v.**

**UNITED STATES OF AMERICA,**

                    *Defendant.*

_____

| |
|---|
| Breach of Trust; Taking; Indian Tribal Claims; Indian Trust Accounting Statute; Continuing Claims Doctrine; Settlement Agreements; Statute of Limitations; Indian Claims Commission Act; Recognized Title; Accounting Claims |

*Jeffrey S. Rasmussen*, Fredericks, Peebles & Morgan LLP, Louisville, CO, for plaintiff.

*Brigman L. Harman*, U.S. Department of Justice, Washington, DC, for defendant.

## ORDER AND OPINION

**Hodges,** *Senior Judge.*

Plaintiff Ute Indian Tribe of the Uintah and Ouray Indian Reservation filed this complaint alleging that the United States: (1) breached its trust and fiduciary duties; (2) violated several congressional acts; (3) took its property in violation of the Fifth Amendment; and (4) failed to account for all land and for all revenue derived from land and resources on its reservation. Defendant moved to dismiss the complaint for lack of jurisdiction and failure to state a claim upon which relief can be granted. In the alternative, it sought summary judgment on the legal issue of whether the Tribe waived its claims in settlement agreements with the Government.

Months after the parties had briefed the Government's motion, the Tribe filed a motion for leave to file a surreply, contending that the Government's reply had raised four new legal arguments. The Government opposed the Tribe's motion. The Tribe does

not oppose the court considering the allegedly new arguments, and it does not object to a surreply by the Government; it urges, however that we decide these issues on the merits.

We grant the Tribe's motion to file a surreply. The Government's motion to dismiss is granted in part and denied in part, as the question of title to the Tribe's reservation must be settled first to resolve all issues raised in the briefs.

## BACKGROUND

The Ute Tribe is a federally recognized Indian tribe that comprises the Uintah, the Whiteriver, and the Uncompaghre bands of Ute people, occupying the Uintah and Ouray Indian Reservation in Utah. It alleges mismanagement, wrongful appropriation of revenue, and taking of the Tribe's surplus property within the Uncompahgre Reservation. Plaintiff claims that the Government violated acts of Congress that created federal trust ownership of the lands on the Uncompahgre Reservation for the Tribe's benefit.

I    Historical Background

1.  *Allotment Period*

The relationship between the Ute people and the United States can be traced back to the early 1860s.[1] According to plaintiff, the United States entered into a treaty in 1868 that created the current Ute Tribe. Under the 1868 Treaty, the Tribe ceded portions of their aboriginal lands to the United States while reserving approximately 15.7 million acres. Compl. ¶ 13. That reservation was wholly within the boundaries of what would become the State of Colorado, and was reserved for the Bands' "undisturbed use and occupation." *Id.* (quoting Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619, II Kapp 990).

Pursuant to a congressional act in 1880, however, the Uncompahgre Band agreed to cede their 1868 reservation to the United States. *Id.* ¶¶ 15–17 (citing Act of June 15, 1880, ch. 223, 21 Stat. 199, 200). The 1880 Act provided for "their settlement upon lands in severalty," with provisions for "[a]llotments in severalty of said lands." 21 Stat. at 199–200. The Band would be relocated to agricultural lands in Colorado if a sufficient quantity of land were found. Otherwise, unoccupied agricultural lands in Utah would be provided.

---

[1]  The Tribe states that in 1861 President Abraham Lincoln reserved around 2 million acres of land to which the Tribe held "aboriginal title" as an Indian reservation. It also states that the Uncompahgre Band entered into a treaty with the United States in 1863, whereby it reserved certain lands within Colorado, Utah, and New Mexico. Compl. ¶¶ 11–12.

The commission tasked with carrying out the congressional act determined that the lands near Colorado lacked sufficient agricultural land, so it identified land in Utah for the purpose of relocation. Consistent with Congress' 1880 Act, President Chester Arthur issued an order in 1882 that set apart 1.9 million acres as a reservation for the Uncompahgre Band in the area of northeastern Utah.

The Tribe asserts that the Uncompahgre Band occupied and used the Uncompaghre Reservation for more than a decade, and that the Government treated the reservation like all other reservations. It asserts, however, that the Government continued to press its now discredited policy of allotment on the Uncompaghre Reservation.

The term "allotment" refers to Congress' past practice of dividing or allotting communal Indian lands into individual parcels for private ownership by tribal members. *See Solem v. Bartlett*, 465 U.S. 463, 466–67 (1984). "Unallotted lands" are those contained within the original 1882 Uncompahgre Reservation area that were not assigned or associated with any particular Indian claimant. These lands were left open for non-Indian settlement.

The Tribe maintains that to overcome the "Uncompahgre Band's resistance to allotment, Congress passed two additional acts attempting to force allotment on the Tribe and extending the deadline for allotment." Compl. ¶ 27. Under the 1894 Act, Congress authorized the allotment of the Uncompahgre Reservation.

Following the approval of allotments by the Secretary of the Interior, un-allotted lands on the reservation would be "restored to the public domain and made subject to entry [under the homestead and mineral laws of the United States]." Act of Aug. 15, 1894, ch. 290, §§ 20–21, 28 Stat. 337. Due to the Tribe's opposition, however, these allotments were not applied.

The Tribe contends that pressure to open the Uncompahgre Reservation to non-Indian settlement continued, so Congress passed another act in 1897. Under the 1897 Act, Congress authorized allotment of the reservation and provided that un-allotted lands, after April 1898, would be "open for location and entry under all the land laws of the United States." Act of June 7, 1897, ch. 3, 30 Stat. 62, 87. The Tribe states that the commission did not make allotments to the Tribe by the April 1898 deadline. Compl. ¶ 31. By separate legislation, however, Congress confirmed eighty-three allotments to Uncompahgre Band members, totaling approximately 12,500 acres in the Uncompahgre Reservation. Compl. ¶ 32 (citing Act of Mar. 1, 1899, ch. 324, 30 Stat. 924, 940–41).

The Tribe states that despite the allotment provisions of the 1880, 1894, and 1897 acts, which were intended to be read together, the United States did not pay the Uncompahgre Band for the un-allotted surplus land of the Uncompaghre Reservation that

3

were disposed of after the 1898 deadline, nor did it deposit the proceed from the land into an account for the Tribe. Compl. ¶¶ 33–35 (stating that pursuant to the 1880 Act, the remaining proceeds from the land sales "shall be deposited in the Treasury as now provided by law for the benefit of the said Indians" (quoting 1880 Act, 21 Stat. at 204)).

### 2.    Post-Allotment Period

Initially, little non-Indian activity occurred within the Uncompaghre Reservation. However, by the late 1920s, operations by non-Indian settlers began to threaten the Tribe's growing livestock industry. To conserve the grazing range while Congress devised a permanent solution, the Secretary of the Interior took steps in 1933 to withdraw temporarily the vacant lands covered by the 1882 order from further disposition as a grazing reserve.

The Tribe emphasizes that the 1933 withdrawal was in aid of legislation to make the withdrawal permanent, based upon the "United States' continued recognition that the land was still an Indian Reservation." Compl. ¶¶ 37–38 (stating that the withdrawal order expressly cited authority delegated in section 4 of the Act of Mar. 3, 1927, ch. 299, 44 Stat. 1347). Section 4 provided that "changes in the boundaries of reservations created by Executive order . . . for the use and occupation of Indians shall not be made except by Act of Congress: Provided, That this shall not apply to temporary withdrawals by the Secretary of the Interior . . . ." Act of Mar. 3, 1927, ch. 299, § 4, 44 Stat. 1347.

The 1927 Act, entitled "An Act To authorize oil and gas mining leases upon unallotted lands within Executive Order Indian reservations," provided that

> the proceeds from rentals, royalties, or bonuses of oil and gas lenses upon lands within Executive order Indian reservations or withdrawals shall be deposited in the Treasury of the United States to the credit of the tribe of Indians for whose benefit the reservation or withdrawal was created or who are using and occupying the land, and shall draw interest at the rate of 4 per annum per annum and be available for appropriation by Congress for expenses in connection with the supervision of the development and operation of the oil and gas industry and for the use and benefit of such Indians:

Act of Mar. 3, 1927, ch. 299, § 2, 44 Stat. 1347.

Pursuant to an agreement between agencies in the Department of Interior, the Uncompaghre Reservation lands were placed under the joint management regime of two agencies in 1935.  Compl. ¶ 42 (citing Letter from John Collier, Comm'r of Indian

4

Affairs, and John Deeds, Division of Grazing Control, to the Sec'y of the Interior (July 19, 1935) ("1935 Agreement")).

The 1935 Agreement placed the Uncompahgre grazing reserve under the administration of the Taylor Grazing Act "for the next year and a half or until Congress passed a bill creating a 'new' Uncompahgre Reservation and subject to provisions recognizing the Uncompahgre Band's ongoing beneficial interest in the withdrawn lands." Compl. ¶ 43. The agreement provided that non-Indians were required to pay grazing fees and that they would receive only "temporary grazing licenses which do not create in the licensees vested rights of any kind in and to these lands" and that "the right, title and interest of the Indians in and to the [so-called] ceded Uncompahgre lands shall in no way be jeopardized." Compl. ¶ 44 (quoting 1935 Agreement at 2).

Congress passed an act in 1948 to extend the boundaries of the Uintah and Ouray Reservation. Act of Mar. 11, 1948, ch. 108, 62 Stat. 72. The Tribe contends that it added 270,820 acres within the boundary of the Uncompahgre Reservation and restored them to trust status. The act also directed the Secretary of the Interior to revoke the 1933 grazing withdrawal order. The Bureau of Land Management (BLM) took over management of the remaining lands of the Uncompahgre Reservation, which the Government refers to as the Public Domain Lands. Mot. Dismiss at 5.[2] The Tribe states that BLM "has managed these lands since 1948, leasing the[m] for grazing and oil and gas purposes." Compl. ¶ 55.

The Tribe contends that the Uncompahgre Reservation is Indian Country and that the Tenth Circuit Court of Appeals has repeatedly affirmed that neither the 1897 Act nor subsequent acts have disestablished or diminished the reservation. *Ute Indian Tribe v. State of Utah*, 773 F.2d 1087, 1099, 1092 (10th Cir. 1985) (en banc) ("*Ute III*") (finding that the 1897 Act "merely opened lands to public entry and failed to extinguish the Reservation"). The Tribe states that it has never received any payments from the United States for the BLM's leasing and utilization of these lands from 1933 to the present.[3]

---

[2] The Government states that its use of the term "Public Domain Lands" is consistent with the Deputy Secretary of the Interior's classification of those lands in his 2018 letter denying the Tribe's request for restoration of an area of public domain lands that was withheld from sale pursuant to the 1882 executive order. Mot. Dismiss at 5 n.5 (adding that "Public Domain Lands" are currently administered for multiple-use and sustained yield by the BLM).

[3] For instance, the Tribe states that in December 2017, the BLM conducted an oil and gas lease sale for land within the Uncompahgre Reservation. Compl. ¶ 55.

II    Relevant Procedural Background

The legal basis for the Government's motion to dismiss, including various settlement agreements and court documents, are summarized below:

Defendant states that in 1934 and 1938 the Tribe petitioned the Department of Interior seeking restoration of the Public Domain Lands to tribal ownership in accordance with section 3 of the Indian Reorganization Act of 1934, 48 Stat. 984. Mot. Dismiss at 6–7 (stating that petitions were denied on the grounds that the Public Domain Lands were "not recognized as being of the class intended for restoration to tribal ownership under section 3 of the [Indian Reorganization Act]") (quoting Mot. Dismiss Ex. 2 at 1)).

The Tribe filed a petition with the Indian Claims Commission in 1951, related specifically to the 1882 Uncompaghre Reservation area, with allegations similar to those in this complaint. *Id.* at 7 (citing *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349 (I.C.C. Aug. 11, 1951) (hereinafter "1951 Petition")). The Government explains *inter alia* that:

> The 1951 Petition included allegations that the United States (1) owed the Tribe 'a high degree of fiduciary obligation,' (2) violated the 1880 Act by disposing of '[a]t least, to wit, 400,000 acres of the Uncompahgre Reservation area . . . under the public land laws, for school purposes, and for public reservations . . . . without just compensation,' and (3) failed to 'maintain[] the Uncompahgre Reservation in Utah as a reservation for said Uncompahgre Utes.' [1951 Petition] ¶¶ 5, 10–12. According to the Tribe's 1951 Petition, as a result of the alleged breach of 'its fiduciary obligations,' the Uncompahgre Band was 'rendered homeless' and 'lost the income and produce of the said lands.' [1951 Petition] ¶¶ 11, 13. As compensation, the Tribe sought, among other things, 'the value of the [1,900,000 acres set aside under the 1882 Order], taken from th[e Tribe] by the [1897 Act] . . . , together with the value of the use or income of the said lands.' [1951 Petition] at 8 (prayer for relief).

Mot. Dismiss at 7–8 (paraphrasing and quoting 1951 Petition). The Tribe settled these claims by means of a settlement agreement with the United States in 1965. According to this settlement agreement, the Tribe agreed that, "the entry of a final order . . . shall finally dispose of all claims or demands which the petitioner has asserted or could have asserted against the defendant . . . and petitioner shall be barred from asserting all such

claims or demands in any further action. *Id.* at 8 (quoting *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349 (I.C.C. Feb. 18, 1965), ¶ 4 (2)).[4]

The Government states, moreover, that in 1986, it filed two *amicus* briefs in *Ute III,* where in arguing against certiorari review, it stated that the public lands within the original Uncompahgre Reservation were not held for the benefit of the Tribe and that the Tribe had no claim to receive any revenue from the leasing of these lands. Mot. Dismiss at 7–8 (citing Br. & Suppl. Mem. for the United States as Amicus Curiae, *Utah v. Ute Indian Tribe*, 479 U.S. 994 (1986) (No. 85-1821)).

The Government also points out that the Tribe filed a claim before this court in 2006, seeking monetary damages related to the alleged mismanagement of trust funds and non-monetary assets. It states that the "complaint in that case was not limited to the Public Domain Lands specifically, but instead generally alleged mismanagement and failure to account for all of the Tribe's trust assets and funds." Mot. Dismiss at 9.[5] *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 06-866 L (Fed. Cl.) (Dec. 19, 2006). The lawsuit was resolved when the parties reached a settlement in 2012. The 2012 Settlement Agreement provided for payments to the Tribe in the amount of $125 million, and the Tribe

> waive[d], release[d], and covenant[ed] not to sue in any administrative or judicial forum on any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on harms or violations occurring before the date of the execution of this Settlement Agreement by both Parties and that relate to the United States' management or accounting of [the Tribe]'s trust funds or [the Tribe]'s non-monetary trust assets or resources.

Mot. Dismiss at 10 (quoting Ex. 9 (2012 Settlement Agreement), ¶¶ 2, 4). The 2012 Settlement Agreement states that the claims being settled, include, but are not limited to the United States' alleged: (a) obligation to provide a historical accounting of the Tribe's trust funds and non-monetary trust assets or resources; (b) mismanagement of the Tribe's

---

[4]   *See* Final Judgment, *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349 (I.C.C. Feb. 18, 1965).

[5]   The Government contends that if "the Public Domain Lands are or were held in trust, as the Tribe claims in its complaint filed in this action, its 2006 complaint would have encompassed those lands." Mot. Dismiss at 9 n. 9.

non-monetary trust assets or resources; (c) mismanagement of the Tribe's trust funds; and (d) failure to perform certain trust duties. 2012 Settlement Agreement at 2–5.

According to the 2012 Settlement Agreement, defendant states that the Tribe accepted as accurate the "balances of all of [the Tribe]'s trust fund accounts, as those balances are stated in the most recent periodic Statements of Performance issued by the Office of Special Trustee for American Indians . . . and dated January 31, 2012." *Id.* ¶¶ 7–8. Moreover, before filing suit on claims related to the Government's management of its trust assets, the Tribe would first submit those claims in writing to the Department of the Interior and give that agency an opportunity to address the claims.

The Tribe filed three requests to the Secretary of the Interior in 2017, seeking restoration of the Public Domain Lands to tribal ownership pursuant to section 3 of the Indian Reorganization Act. All three requests were denied on March 2, 2018. The Tribe filed this complaint on March 7, 2018. The next day, it filed an action in the District Court for the District of Columbia challenging the Department of the Interior's decision not to restore the Public Domain Lands and seeking a declaratory judgment that the Public Domain Lands should be held in trust for the Tribe's benefit. Mot. Dismiss at 12.

The Tribe claims that the court has subject matter jurisdiction under 28 U.S.C. § 1491(a)(1) and 28 U.S.C. § 1505. In addition, this action allegedly arises according to: (1) the Treaty of October 7, 1863, 13 Stat. 673; (2) The Treaty of March 2, 1868, 15 Stat. 619; (3) Act of April 29, 1874, 18 Stat. 36; (4) Act of June 15, 1880, 21 Stat. 199; (5) Exec. Order of Jan. 5, 1882, I Kapp. 901 (2d ed. 1904); (6) Act of Mar. 3, 1887, 24 Stat. 548; (7) Act of Aug. 14, 1894, 28 Stat. 286, 337-338; (8) Act of June 7, 1897, 30 Stat. 62, 87; (9) Indian Reorganization Act of 1934, Pub. L. 73-383, 48 Stat. 984; (10) 10 Fed. Reg. 12,409 (1945); and (11) Hill Creek Extension Act, 62 Stat. 72 (Mar. 11, 1948).

The Tribe seeks $500 million in monetary damages against the Government. In Count 1, the Tribe contends that the Government repeatedly breached its trust and fiduciary obligations to the Tribe by: failing to deposit proceeds from the sale of the surplus lands that were opened for 'cash entry' following allotment pursuant to the 1880, 1894 and 1897 Acts in a tribal trust account; failure to deposit compensation for any land exchanged, or sold within the boundaries of the Uncompahgre Reservation in a tribal trust account; and failing to deposit proceeds from grazing and mineral leases or mineral royalties into a tribal trust account." Compl. ¶ 70. Further, it contends, "[a]dditionally or in the alternative, under the 1927 Act and 1933 withdrawal, all money received by the United States from sale or leasing of land or natural resources from the land on the Uncompahgre Reservation were to be deposited in trust for the Ute Tribe." *Id.* ¶ 68. The Tribe maintains that these continuous acts and omissions were inherently unknowable and never apparent from any decree or treaty. *Id.* ¶¶ 72–76.

In Count 2, the Tribe repeats similar allegations as Count 1. However, Count 2 is framed as a violation of the 1880, 1894, 1897, 1927 acts and the 1933 withdrawal order.

In Count 3, the Tribe maintains that Congress has not approved the taking of its land, natural resources, and/or proceeds from those lands and resources. It seeks monetary damages for a taking of its property without compensation.  In Counts 4 and 5, plaintiff contends that it is entitled to "a proper and complete accounting, reconciliation, and certification of the land sales, transfers, or exchanges following the opening of the Uncompahgre Reservation pursuant to the 1880, 1894 and 1897 Acts to aid the Court and the Tribe in a final determination of the damages . . . . In addition, the Defendant should be ordered to preserve all records relating to the opening of the Uncompahgre Reservation pursuant to the 1880, 1894 and 1897 Acts." *Id.* ¶ 88.

Defendant moved to dismiss the Tribe's complaint for lack of jurisdiction and failure to state a claim. In the alternative, it sought summary judgment on the ground that the Tribe has waived and released its claims in the relevant settlement agreements.[6]

## LEGAL STANDARDS

In deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court must accept as true the undisputed factual allegations in the complaint and must construe reasonable inferences in favor of the plaintiff. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Id.* The court may look to evidence outside of the pleadings and inquire into jurisdictional facts to determine the existence of subject matter jurisdiction. *Reynolds v.*

---

[6] The Tribe also sought leave to file a surreply. A party "may not raise new arguments in a reply brief." *Clinicomp Int'l, Inc. v. United States*, 135 Fed. Cl. 477, 482 (2017). The "standard for granting a leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) (denying the petitioner's motion to file a surreply because it did not involve a new matter but rather an alleged mischaracterization). The decision to grant or deny leave to file a surreply is committed to the sound discretion of the court, and in making its decision, the court considers whether the surreply is helpful to the adjudication of the motion and whether the defendant will be unduly prejudiced if the court grants leave. *Plunkett v. Dep't of Justice*, 249 F. Supp. 3d 73, 74 n.2 (D.D.C. 2017) (citation and quotations omitted). Given that the Tribe's surreply and the Government's response in opposition provide very helpful clarifications to this complex case, we grant the Tribe's motion to file a surreply, which is deemed filed. The Government will not be unduly prejudiced.

*Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *Hanover Ins. Co. v. United States*, 116 Fed. Cl. 303, 306 (2014); *see also Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (stating that if the Rule 12(b)(1) motion denies or controverts the pleader's allegations regarding jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction).

Pursuant to the Tucker Act, the court has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Indian Tucker Act, 28 U.S.C. § 1505, confers a like waiver of sovereign immunity for tribal claims that "otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citing § 1505).

An Indian tribe must clear two hurdles before invoking jurisdiction under the Indian Tucker Act. *United States v. Navajo Nation ("Navajo II")*, 556 U.S. 287, 290 (2009). First, a tribe must "identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Id.* (quoting *United States v. Navajo Nation ("Navajo I")*, 537 U.S. 488, 506 (2003)). Second, the court must "determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Id.* (quoting same) (alteration in original). At the second stage, the Court explained that "principles of trust law might be relevant 'in drawing the inference that Congress intended damages to remedy a breach.'" *Id.* (quoting *White Mountain*, 537 U.S. at 477).

To avoid dismissal for failure to state a claim, under Rule 12(b)(6), a "complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The court must accept as true all factual allegations in the complaint and "indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). The court, however, is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). The court may also consider settlement agreements where the parties do not dispute their authenticity. *See Collier v. CSX Transp. Inc.*, 673 F. App'x 192, 197 (3d Cir. 2016).

Summary judgment is appropriate under Rule 56(a) where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## DISCUSSION

The Government raised several arguments to dismiss each of the Tribe's claims, including that pursuant to 28 U.S.C. § 1500, the court "shall not have jurisdiction of any claim for or in respect to which the plaintiff has pending in any other court . . . against the United States." In addressing the issues raised in the motion to dismiss, we are mindful that title and reservation status are not congruent concepts. *Ute III*, 773 F.2d at 1097 (Seymour, J., concurring). The Tribe contends that its case is based on the premise that the 1880 Act created its "recognized title" to the lands in the Uncompahgre Reservation.[7] While the courts accept this contested premise as true for purposes of this motion,[8] it

---

[7]   *But see* Compl. ¶ 5 ("Defendant, the United States, holds **legal title** to the Tribe's lands and natural resources, including much of the land and resources within the exterior boundaries of the Uncompahgre Reservation, and manages such lands and resources through the Department of the Interior." (emphasis added)).

[8]   The Tribe's assertion that it has "recognized title" was discussed in *dicta* in *Ute III*. The court in *Ute III* considered *inter alia* the status of the reservation; i.e. whether the reservation had been disestablished by Congress through the 1894 and 1897 acts. In writing the majority opinion, which held that the Uncompahgre Reservation had not been disestablished, Judge Doyle first wrote, "As to the questions whether the acts dealing with . . . the Uncompahgre Reservation mean that the Indians lost title to these lands, the view of this writer is contrary to the view of the trial court." 773 F.2d at 1088. In contrast, when considering the status of the Uncompahgre Reservation, the four concurring judges, opined that:

> [O]n January 5, 1882, President Arthur established the Uncompahgre Reservation by an Executive Order. (LD 12). **Nothing in the 1880 Act required him to do so**; in fact, the Secretary and the Commissioner had been empowered to designate appropriate land for allotment. He may have felt obligated to create the reservation simply because no land was 'found' or 'available' to the Uncompahgres in Colorado. Instead, the Tribe was forced to settle in a barren region of Utah no one else yet wanted, where there were, at most, 10,000 acres of arable land out of the nearly two million acre reservation. Although the 1880 Act spoke only in terms of title to land, the subsequent Executive Order indisputably created jurisdictional rights for the Uncompahgres. It is well settled that a reservation created by executive order has the identical legal status as one created by Congress. *See* [*Mattz v. Arnett*, 412 U.S. 481, 492–94 (1973)]. **Moreover, since title and reservation status are not congruent concepts,**

11

raises the complex corollary issue of whether the Tribe's "recognized title" has been extinguished and, if not, whether the statute of limitations or the Tribe's 1965 and 2012 settlement agreements might still preclude it from asserting any claims in this court.

    1. <u>Pending Claims in the District Court for the District of Columbia</u>

The Government contends that, pursuant to 28 U.S.C. § 1500, the court lacks jurisdiction to consider this case because the Tribe has the same claim pending before the District Court for the District of Columbia. Under § 1500, "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 317 (2011). To assess whether section 1500 applies, the court must answer two fundamental questions: "(i) whether the district court action was 'pending' at the time jurisdiction under section 1500 is measured; and

---

> **the 1882 Executive Order in no way interfered with Congress' intent that the Uncompahgres hold no title to the land**. It merely provided a reservation within which, until the allotment process was complete, the Uncompahgres had temporary occupancy of the whole . . . . **The end result was an Indian reservation where the Indians held title to their allotted parcels and the remainder of the land was opened to the public.**

*Id.* at 1097 (Seymour, J., concurring) (emphasis added). The concurring judges in *Ute III* went on to state that:

> **The fact that the Uncompahgres did not own the land within their reservation explains why members of Congress and others considered the Uncompahgres to be in a different position than the Uintahs, who did hold title to the land within their reservation. It also explains why the United States did not have to pay the Uncompahgres for the land subsequently opened to the public.** That the Uncompahgres only had temporary occupancy rights within the reservation before they received their allotments, however, does not undermine their claim that the jurisdictional boundaries were never extinguished, given the distinction between title and jurisdiction.

*Ute III*, 773 F. 2d at 1097 n.7 (Seymour, J., concurring) (emphasis added).

(ii) if so, whether the claims presented to the district court were the same as those in the instant case." *Skokomish Indian Tribe v. United States*, 115 Fed. Cl. 116, 123 (2014).

The Federal Circuit has explained that the § 1500 bar operates "'*only* when the suit shall have been commenced in the other court *before* the claim was filed in [the Claims Court].'" *Res. Invs., Inc. v. United States*, 785 F.3d 660, 669 (Fed. Cir. 2015) (quoting *Tecon Eng'rs, Inc. v. United States*, 343 F.2d 943, 949 (Ct. Cl. 1965)). The Supreme Court in *Tohono* acknowledged that the precedent in our circuit left section 1500 "without meaningful force." 563 U.S. at 314. The Court indicated that the holding in *Tecon* was not presented in its case, however. *Id.* at 315 (adding that "[s]till, the Court of Appeals was wrong to allow its precedent to suppress the statute's aims. Courts should not render statutes nugatory through construction. In fact the statute's purpose is clear from its origins with the cotton claimants—the need to save the Government from burdens of redundant litigation—and that purpose is no less significant today").

While a mechanical application of § 1500, here, may not be consistent with its purpose, we are bound by circuit precedent. *Res. Invs., Inc.*, 785 F.3d at 670 ("We are bound by *Tecon*, which 'remains the law of this circuit.' (quoting *Brandt v. United States*, 710 F.3d 1369, 1379 n.7 (Fed. Cir. 2013))). The Tribe filed its claim in our court on March 7, one day before filing a claim in the district court. Based on these facts, *Tecon* prevents the court from scrutinizing whether the claims are the same, and potentially saving the Government from the burden of redundant litigation. While we have reservations here regarding the propriety of a mechanical application of § 1500, as set out in *Tecon* and affirmed in our circuit, the Government's § 1500 claim must be denied.

## 2.   Breach of Trust and Violation of Congressional Acts Claims (Counts 1 & 2)

The Government avers that the Tribe's breach of trust and violation of congressional acts claims should be dismissed because: (A) they fail to identify a money-mandating statutory or regulatory trust duty; the (B) claims are barred by the statute of limitations; and (C) the claims are limited to post-2012 Settlement Agreement conduct.

### A.   *Money-Mandating Statutory or Regulatory Duty*

#### i.   Arguments Submitted by Parties

The Government contends that none of the Tribe's eleven alleged sources of fiduciary obligations includes an obligation to deposit monies in a tribal account. It states that:

- The Treaty of October 7, 1863, makes no reference to monies from land sales or exchanges or grazing or mineral leasing. *See* 13 Stat. 673.

- The Treaty of March 2, 1868, though setting aside a sum of money to be held in trust, makes no reference to land sales or exchanges or grazing or mineral leasing, let alone where any proceeds from those actions should be held. *See* 15 Stat. 619.

- The Act of April 29, 1874, ratifies an earlier agreement between the Tribe and the United States whereby the Tribe agreed to transfer lands in Colorado to the United States in exchange for the United States holding in trust a sum of money in exchange for that trust. *See* 18 Stat. 36, Art. I & III. It says nothing, however, about subsequent land sales or exchanges or grazing or mineral leasing.

- The Act of June 15, 1880, though providing a payment to the Tribe for consenting to the underlying agreement, makes no reference to land sales within the original 1882 Uncompahgre Reservation area or land exchanges, grazing, or mineral leasing, let alone where any proceeds of those actions should be held. *See* 21 Stat. at 201, 204. The Act itself authorized the Secretary to allot lands to individual Indians and provided all land not allotted would become public lands open to entry. *Id.* at 203. Proceeds from those sales were to be used to reimburse the United States, then applied to payments for lands outside the reservation ceded to the Indians by the United States, and then (if any remained) to be deposited in Treasury for the benefit of the Indians. *Id.* at 203-4. Neither the Treaty nor the Act say anything about future lands sales or exchanges or grazing and mineral leasing.

- The Executive Order or January 5, 1882, established the original 1882 Uncompahgre Reservation, but says nothing about land exchanges or sales or grazing or mineral leasing. *See* 1 Kapp. 901 (2d ed. 1994).

14

- The Act of March 3, 1887, addressed railroad rights of way; it does not address land exchanges or sales or grazing or mineral leasing. *See* 24 Stat. 548.

- The Act of August 14, 1894, authorized a commission to allot grazing and agricultural lands to individual Uncompahgre Indians (not the Tribe), and opened any unallotted lands to entry under the homesteading and mineral laws. See 28 Stat. 286, 337–38. The Act says nothing about monies from subsequent lands sales or exchanges or grazing or mineral leasing.

- The Act of June 7, 1897, directed the allotment of agricultural lands to the Uncompahgre Ute Indians and directed that all unallotted lands would be open for location and entry under the United States' land law. *See* 30 Stat. 62, 87. The Act says nothing about subsequent lands sales or exchanges or grazing or mineral leasing.

- The Indian Reorganization Act of 1934, Pub. L. No. 73-383, 48 Stat. 984 (1934), is not money-mandating. *See Wopsock v. Natchees*, 454 F.3d 1327, 1332–33 (Fed. Cir. 2006).

- 10 Fed. Reg. 12,409 (Oct. 2, 1945), is a Secretarial decision, not a statute or regulation as would be required to create any money-mandating trust obligations.

- The Hill Creek Extension Act, Pub. L. No. 440, 62 Stat. 72 (Mar. 11, 1948), added lands to the Uintah and Ouray Reservation, but says nothing about land sales or exchanges; references grazing only to reserve a stock watering right of way; and references minerals only to reserve certain rights for the United States. *See* 62 Stat. 72, 77.

Mot. Dismiss at 19–21 (arguing that allegations ignore the Supreme Court's ruling that "not every claim invoking the Constitution, a federal statute, or a regulation is cognizable . . . ." (quoting *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206, 216 (1983)).

The Government asserts that a fiduciary obligation cannot be premised on control alone over these lands. *Id.* at 21 (citing *Navajo II*, 556 U.S. at 301). It refers to *Mitchell*

*II*, where the Supreme Court concluded that a money-mandating duty existed based on the "pervasive" role the Department of Interior played in regulating virtually every aspect of forest management. *Id.* (citing *Mitchell II*, 463 U.S. at 219–20). It explains that the Supreme Court in *Mitchell II* found that: "The regulatory scheme was designed to assure that the Indians receive the benefit of whatever profit [the forest] is capable of yielding." *Id.* (quoting *Mitchell II*, 463 U.S. at 221–22 (citation and internal quotations omitted)). The Government maintains that the Tribe has presented nothing close to *Mitchell II*.

The Government contends, moreover, that numerous events demonstrate that Public Domain Lands are not and have not been held in trust or treated as trust assets, including:

- the 1897 Act (which opened up the Public Domain Lands to non-Indian Settlement);

- the Tribe's 1934 and 1938 petitions for restoration asking that the Public Domain Lands be restored to tribal ownership, and the denial of both petitions;

- the 1948 Act whereby the Public Domain Lands were again opened to non-Indian interests and resulted in BLM control and management of those lands thereafter;

- the 1951 Petition before the Indian Claims Commission wherein the Tribe specifically alleged that the United States had 'disposed' of at least some of the Public Domain Lands, had not provided the Tribe with a reservation, and that the Tribe was not receiving proceeds from those lands; and

- the 1965 Settlement Agreement whereby the Tribe received just compensation for the United States' alleged taking of the original 1882 Uncompahgre Reservation area (including resources).

Mot. Dismiss at 13; *see also* Def.'s Reply at 12 (arguing that based on the Government's interpretation of the 1897 Act, it "has not considered the Tribe to be a beneficial interest holder in the Public Domain Lands—or treated those lands as trust assets—for decades"). The Government contends that to

> the extent the Tribe's legal theory is correct—that the Tribe holds a beneficial interest in the Public Domain Lands that the United States has not recognized—its arguments support a

16

claim for an improper taking (based on the United States'
assertion of full title) rather than for breach of a fiduciary
duty based on a failure to pay revenues derived from those
nontrust lands (the actual duty alleged in the complaint).

Def.'s Reply at 12 (reiterating that the 1880 Act "makes no reference to land sales within
the original 1882 Uncompahgre Reservation area or land exchanges, grazing, or mineral
leasing, let alone where any proceeds of those actions should be held"). The Government
maintains, moreover, that it expressly repudiated any trust duties with respect to the
Public Domain Lands in its amicus submissions before the Supreme Court in 1986. [9]

        In its opposition, the Tribe maintains that its claims are based on the premise that
the 1880 Act created the Tribe's "recognized title" to the lands in the Uncompahgre
Reservation. Pl.'s Opp'n at 1 (asserting that if the court agrees that the 1880 Act created
recognized title, then the money the United States received from the land is the Tribe's).[10]
The Tribe disagrees with the Government's assertion that the Tribe's relevant association
with the land dates back to 1880. *Id.* at 5 n.3. Instead, it explains that under the 1868
Treaty, the Uncompahgre Band ceded land to the United States in exchange for the
United States, through Congress, recognizing a reservation for the Band in Colorado. *Id.*
at 5 (stating that the 1868 Treaty states that the lands reserved by the Government for the
Ute homeland were "set apart for the[ir] absolute and undisturbed use and occupation").

        The Tribe repeats that, pursuant to the 1880 Act, Congress directed the Executive
Branch to create a replacement reservation in Colorado or Utah. *Id.* at 5 n.3 (stating that
the Executive Branch carried out this directive, took the Band's Colorado reservation,
and created the replacement reservation in Utah). It states that the Uncompahgre
Reservation was a statutory reservation not an executive order reservation. The Tribe
contends that because trust ownership was created by an act of Congress, it can only be

---

[9]   The Government also asserts that the Tribe's recent actions demonstrate that it is aware
      that the Public Domain Lands are not held in trust. It points to the Tribe's: (1) requests
      for the Department of Interior to restore the Public Domain Lands to tribal ownership that
      were denied in 2018; and (2) its action before the District Court for the District of
      Columbia, wherein it alleges that the Government does not currently hold the Public
      Domain Lands in trust, but that it *should*. Mot. Dismiss at 14 (emphasis added) (arguing
      that "[i]t is well established . . . that [a pleading] from one proceeding is indeed
      admissible and cognizable as an admission in another." (quoting *Enquip, Inc. v. Smith-
      McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981))).

[10]  The Government observes that the Tribe often conflates the issues raised in the motion to
      dismiss with the ultimate merits of the legal claims. Def.'s Reply at 1–2 (contending that
      the issue at hand is not the actual meaning of these acts, but whether the Tribe has
      asserted valid and timely causes of action over which this court has subject jurisdiction).

altered by an act of Congress. *Id.* at 8 (citing, e.g., *Neb. v. Parker*, 136 S.Ct. 1072 (2016)). It maintains that a federal statute is valid until superseded by a contrary statute; and that tribes do not lose their lands by adverse possession or violations of statutes by the Executive Branch.

The Tribe notes that after the Executive Branch had carried out its duty to create a replacement statutory reservation, Congress authorized the President to act as the Tribe's broker for sale of land on the reservation. 1897 Act. The Tribe contends that it is not challenging the President's authority to sell portions of the Tribe's land as its broker. It contends, however, that much of the land on the reservation was never sold or subject to other acts of Congress altering its ownership. It maintains that the Government still owns that land and has the duty to provide the proceeds of sales from that land to the Tribe.

ii.   Court's Analysis and Findings

As an initial matter, we note that each of the Tribe's eleven alleged sources of fiduciary duty referenced in its complaint were challenged by the Government. Despite having the burden of establishing jurisdiction, the Tribe did not address each of these objections. Besides neglecting to respond to several arguments challenging the jurisdictional basis of its claims, the Tribe has not shown that the 1880 Act, read in conjunction with the 1868 Treaty, the 1894 Act, and the 1897 Act, establishes a specific fiduciary duty (Count 1). The acts referenced above, likewise, are not money mandating statutes, violations of which would require compensation by the Government (Count 2).

To establish that the United States has accepted a particular fiduciary duty, "an Indian tribe must identify statutes or regulations that both impose a specific obligation on the United States and bear the hallmarks of a conventional fiduciary relationship." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (citation and quotation marks omitted). Here, the Tribe argues that 1868 Treaty, which provides that lands were reserved for the Tribe's undisturbed use and occupation, read in conjunction with the 1880 Act and other acts, created a fiduciary duty. The 1880 Act provides in relevant part,

> That the Secretary of the Interior be, and he is hereby authorized to cause to be surveyed, under the direction of said commissioners, a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided. And upon the completion of said survey and enumeration herein required, the said commissioners shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement above mentioned, and whenever the report and proceedings of said commissioners, as required by

this act, are approved by the President of the United States, he shall cause patents to issue to each and every allottee for the lands so allotted, with the same conditions, restrictions and limitations mentioned therein as are provided in said agreement; and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands, at the same price and on the same terms as other lands of like character, except as provided in this act: *Provided*, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law, but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale, shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at one dollar and twenty-five cents per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided for in this act.

1880 Act, 21 Stat. at 203–04. The Tribe, however, fails to develop how this provision of the 1880 Act—read together with the 1868 Treaty, the 1894 Act, and the 1897 Act—bears the hallmark of a trust relationship in line with the Supreme Court's understanding.

The Tribe has not met its burden of demonstrating that the Government has "full responsibility to manage" the lands, resources, or proceeds for their benefit. *Mitchell II*, 463 U.S. at 224. This is especially relevant, given that a trust obligation cannot be premised on control alone, and that *Mitchell II* distinguished between bare trusts and statutes giving the Government full responsibility to manage land and resources for their benefit. *Id.* at 225 (finding that breach of the latter is enforceable with a damage award).

As the Government aptly observed, the Tribe has presented nothing close to the statutory scheme in *Mitchell II*. The Court in *Mitchell II* found that a money-mandating duty existed based upon the "pervasive" role the Department of the Interior played in

> virtually every aspect of forest management including the size
> of sales, contract procedures, advertisements and methods of
> billing, deposits and bonding requirements, administrative fee
> deductions, procedures for sales by minors, allowable heights
> of stumps, tree marking and scaling rules, base and top
> diameters of trees for cutting, and the percentage of trees to
> be left as a seed source.

Mot. Dismiss at 21 (quoting *Mitchell II*, 463 U.S. at 219–20). The Supreme Court noted
*inter alia* that there were regulations detailing the scope of federal supervision. *See
Mitchell II*, 463 U.S. at 223 ("For example, an applicant for a right-of-way must deposit
with the Secretary an amount not less than the fair market value of the rights granted,
plus an amount to cover potential damages associated with activity on the right-of-way.
The Secretary must determine the adequacy of the compensation, and the amounts
deposited must be held in a special account for distribution to Indian landowners.").
Unlike *Mitchell II*, the Tribe does not establish nor define the contours of the
Government's full fiduciary responsibility to manage the lands, resources, or proceeds.

The Government asserts, moreover, that it has not treated the Public Domain
Lands as trust assets for decades nor considered the Tribe to be a beneficial interest
holder in them. Mot. Dismiss at 25–26; Def.'s Reply at 12 (arguing that the Tribe's
"arguments support a claim for an improper taking (based on the United States' assertion
of full title) rather than for breach of a fiduciary duty based on a failure to pay revenues
derived from those non-trust lands (the actual duty alleged in the complaint")). The Tribe
retorts that the Government's misinterpretation of an act should not stand because only
Congress can take a Tribe's right to compensation from land to which Congress gave the
Tribe title. Pl.'s Sur-Surreply at 3–4 (arguing that the Government has an ongoing duty to
comply with congressional acts and that only Congress may divest a tribe of its title).

The Tribe's argument raises the non-negligible question of whether the Executive
Branch's misinterpretation of congressional act can operate as a taking of title in the
Indian law context. It is more appropriately addressed under takings theories, however,
given the Tribe's claim that it has "recognized title" to the lands in the reservation.

The Tribe's reliance on the IRA and the 1945 Restoration Order is likewise
undeveloped and without merit. In support of dismissal, the Government referred to
*Wopsock*, where the Federal Circuit held that the IRA "cannot fairly be interpreted as
mandating compensation by the federal government for the injury claimed by the
plaintiffs." 454 F.3d at 1332. The Tribe correctly distinguishes *Wopsock*, when it states
that the alleged injury there was a violation of a provision requiring the Secretary to call
and oversee elections adopting or amending a tribal constitution. Pl.'s Opp'n at 10.

20

The Tribe neglects, however, to carry its burden of showing that other sections of the IRA mandate monetary compensation. In support of its claim for jurisdiction, the Tribe simply states that "many of the sections of the IRA require the United States to protect tribal real property and extend federal trust ownership over real property." Pl.'s Opp'n at 10 (asserting that tribes "definitely do have the right to bring cases in this Court for monetary damages from federal takings of tribal money" (referring to IRA, §§ 1–7)). The Tribe offers no statutory analysis, but simply its conclusions. The Tribe has not met its burden of identifying a specific-rights creating duty that mandates compensation.

Regarding the 1945 Restoration Order, the Tribe insists that the "restoration of land to tribal trust **would** impose upon the United States the well-established real property trust duties which are created by statutes." Pl.'s Opp'n at 10–11 (emphasis added). It is not clear what we should make of the Tribe's conclusory assertion. The 1945 Restoration Order provides that

> I hereby find that restoration to tribal ownership of all lands which are now or may hereafter be classified as undisposed-of opened lands of the Uintah and Ouray Reservation will be in the public interest, and the said lands are hereby restored to tribal ownership for the use and benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah, and are added to and made a part of the existing reservation, subject to any valid existing rights.

10 Fed. Reg. 12,409. The Tribe appears to be advancing a normative claim, though so far it has not developed the claim. The language of the 1945 Restoration Order is indicative of a bare trust insufficient to establish jurisdiction. *See Mitchell I*, 445 U.S. at 542 (finding that statute providing that United States retained title to lands in trust for the sole use and benefit of Indian tribe had created a limited trust). It is the Tribe's burden to demonstrate that jurisdiction exists, however; its undeveloped position does not satisfy this burden.

The Government has not expressed a firm desire that the Tribe should retain the benefits derived from the land, resources or proceeds. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 149 (1980)). *See* Counts 1 and 2.

Neither party has expressly addressed the Tribe's alternative claims that "under 1927 Act and 1933 withdrawal, all money received by the United States from sale or leasing of land or natural resources from the land on the Uncompahgre Reservation were

to be deposited in trust . . . ." Compl. ¶ 68. While it is unclear how the Tribe's alternative arguments should be appreciated, as discussed further below, we need not grapple with this issue as the Government's repudiation of any trust duties disposes of the Tribe's trust claims, including its alternative trust claim.

### B.  Statute of Limitations

The Government contends that the Tribe's trust claims are time barred by 28 U.S.C. § 2501, which requires that claims be filed within six years after they first accrued. The trust claims are based on defendant's alleged failure to deposit proceeds into the tribe's trust accounts. Defendant disputes the Tribe's claims that this alleged failure constitutes "continuous acts and omissions" that toll the statutes of limitations, and the Tribe's reliance on the Indian Trust Accounting Statute, Pub. L. 113-76, § 1, Div. G, Title I, 128 Stat 5, 305–306 (2014).

### i.   Continuing Claims Doctrine

The Government asserts that the continuing claims doctrine is unavailing because the alleged missing deposits are not continuous acts, but cumulative effects from a single governmental action outside of the limitations period. Mot. Dismiss at 30. More specifically, it argues that this simply means that the *effects* of defendant's earlier decisions not to hold the Public Domain Lands in trust—through the 1897 Act, the 1948 Act, or (at the latest) the United States' 1986 repudiation—are continuing. *Id.* at 30–31.

The "proper focus for statute of limitations purposes is upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts-became most painful." *Goodrich v. United States*, 434 F.3d 1329, 1333–34 (Fed. Cir. 2006) (quoting *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995)). The continuing claims doctrine applies to claims that are "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1145 (Fed. Cir. 2008) (quoting *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997)). This court has recognized that the doctrine applies to cases where

> (a) Congress had not entrusted an administrative officer or tribunal with the determination of the claimant's eligibility for the particular pay he sought; (b) the cases turned on pure issues of law or on specific issues of fact which the court was to decide for itself (i.e., Congress had not established any administrative tribunal to decide either the factual or the legal

questions); and (c) in general the cases called upon the court to resolve sharp and narrow factual issues not demanding judicial evaluation of broad concepts such as 'disability' (concepts which involve the weighing of numerous factors and considerations as well as the exercise of expertise and discretion). For such cases—in which no administrative agency has been set up to decide the claim, and the court passes de novo on all issues of law and fact—the 'continuing claim' doctrine is wholly appropriate.... And where the payments are to be made periodically, each successive failure to make proper payment gives rise to a new claim upon which suit can be brought.

*Caraballo v. United States*, 124 Fed. Cl. 741, 748–49 (2016) (quoting *Friedman v. United States*, 310 F.2d 381, 381 (1962)). The court in *Caraballo* explained, moreover, that the continuing claims doctrine applies where recurring payments are required. *Id.* It is not so clear that the 1880 Act requires recurring payments.

We note that the Tribe does not grapple with the apparent consequences of the 1897 Act on the obligation to deposit proceeds into an account. The Tribe does little to dispel the interpretation of the 1897 Act proffered by the Government, which is that the 1897 Act took, or superseded,[11] whatever right to proceeds it might have had. The Tribe

_____

[11] This claim appears to align with the Department of Interior's conclusion in 2018 regarding the operation of the 1897 Act. The parties did not discuss this argument in the briefings, however. In its 2018 memorandum denying the Tribe's restoration requests, the Department of Interior first explained that "allotments to the Uncompahgres should be made under the acts of 1880, 1894 and 1897, giving controlling force to the later act where there is any difference in their provisions." Mot. Dismiss Ex. 1 at 52 (citing *Indian Lands-Allotment-Uncompahgre Utes*, 25 L.D. 97, 103 (Aug. 5, 1897)). The Department determined that whereas the 1880 Act provided for payments, the 1897 Act did not provide for payments or specific benefits to the Tribe. Given the differences, the Department concluded that the 1897 Act was controlling and stated that:

Whatever controlling effect the 1880 agreement may have had over the general future disposition of lands, it was necessarily superseded by the express Congressional intent affecting the Uncompahgre Reservation in the 1897 Act . . . . In addition, and most importantly, the Department must give effect to the later statutes disposing of the

offers instead an indirect rebuttal, based on differences between executive and legislative acts. However, *see Entines v. United States*, 39 Fed. Cl. 676, 682–83 (1997) (rejecting a claim that relied on the continuing claims doctrine). The court held that the plaintiff's entitlement claims for veteran benefits were for compensation for property taken by the passage of a statute—not a failure to make payments required by law. We agree.[12]

The continuing claims doctrine does not toll the statutory period in this case. The Tribe's reliance on the continuing claims doctrine is akin to the unsuccessful claim in *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998). In *Ariadne*, the plaintiff sought compensation for the government's repudiation of a contract that promised continued performance into the future. *Id.* at 879 (stating that the government made clear its intent to reject the terms of the contracts). The Federal Circuit held that the Government's subsequent denial or refusal to perform flowed from its original repudiation and therefore the doctrine did not preserve the claim. *Id.* Here, the Government repudiated any trust duties it might have had in its amicus briefs to the Supreme Court in 1986—if not earlier. The Tribe was on notice that the Government's subsequent failure to deposits funds arose from its repudiation, as in *Ariadne*.

The Tribe emphasizes that the plaintiff in *Ariadne* was seeking compensation for a repudiation of a *contract* promising continued performance. Pl.'s Surreply at 4 (emphasis added). Plaintiff contends that while "a party can repudiate its obligations set in a contract, a party cannot similarly repudiate its obligation to comply with federal law." *Id.* (contending that the Executive Branch's dispositive error in its motion is that the Tribe's recognized title to the Uncompahgre Reservation stems from a congressional act, and that only Congress may divest an Indian tribe of its recognized title to Indian land).

While the Tribe raises an interesting argument regarding *Ariadne*, the Federal Circuit's holding in *Jones v. United States*, 801 F.2d 1334 (Fed. Cir. 1986) confirms that

---

Uncompahgre Reservation, in particular the 1897 Act. Nothing in the 1894 and 1897 Acts provided monetary benefit to the Tribe from the sale of lands within the Uncompahgre Reservation. Without the specific inclusion that proceeds would be held for the benefit of the Tribe, the 1897 Act presumed that un-allotted land in the public domain remained the absolute property of the United States.

*Id.*

[12] We do not address the issue of whether the 1897 Act effectuated a taking. Rather, to the extent that the Tribe's theory raises a claim, it supports a taking claim.

this argument is without merit.  In *Jones*, the Federal Circuit held that the United State, as trustee, may repudiate an express trust by words or by actions inconsistent with its obligations under the trust. *Id.* at 1336. The trust obligations at issue had their source in a congressional act, the General Allotment Act, ch. 119, 24 Stat. 388 (1887), as amended, 25 U.S.C. § 348 (1982). In concluding that the plaintiff beneficiary's claim was barred by the statute of limitation, the court also stated that, "To the extent that [plaintiff] stated a claim against the United States for taking of property, the alleged taking occurred more than six years prior to the commencement of this case." *Id.* at 1335.[13] Thus, the fact that the source of the alleged obligation is found in a congressional act (as opposed to a contract) cannot permit the Tribe to rely on the continuing claims doctrine to avoid the limitations period. If the Tribe holds title, its arguments may support a claim for a taking. The continuing claims doctrine does not operate to preserve its trust claims, however.

ii.   Indian Trust Accounting Statute (ITAS)

The Tribe's reliance on the ITAS to suspend the statutes of limitations is also without merit, according to the Government. The ITAS, which has been included in appropriations acts since 1990, provides in relevant part that:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected Indian tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub. L. 113-76, § 1, 128 Stat 5, 305–306 (2014). When the ITAS applies, the "Tucker Act's statute of limitations does not begin to run, nor does a claim accrue for breach of fiduciary duty regarding a trust fund, until the complaining Indian tribe or individual has received an accounting, thereby learning of the trustee's repudiation." *Rosales v. United States*, 89 Fed. Cl. 565, 580 (2009) (citing *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1347–48 (Fed Cir. 2004)).

The Government maintains that the ITAS does not save the Tribe's trust claims for three reasons. First, the ITAS was last enacted in 2014 and that no tolling provision is in

---

[13]   In rejecting the plaintiff's claim, the Federal Circuit in *Jones* referenced the Supreme Court's decision in *United States v. Mottaz*, 476 U.S. 834 (1986), which found that the statute of limitations applied to a breach of fiduciary duty under the Quiet Title Act).

place upon which the Tribe can rely. Second, it maintains that an accounting is not necessary to put the Tribe on notice, given the Government's express repudiation in 1986 of the Tribe's rights or ownership of the Public Domain Lands. Mot. Dismiss at 32 (citing *Wolfchild v. United States*, 731 F.3d 1280, 1291 (Fed. Cir. 2013), which found the ITAS inapplicable and held that where "a claim concerns an open repudiation of an alleged trust duty, a final accounting is unnecessary to put the claimants on notice of the accrual of their claim" (internal quotation marks and citation omitted)).

Third, even if an accounting had to be provided before the Tribe's claim accrued, the Tribe was sent an accounting of its trust fund accounts on "February 22, 2012—more than six years before the filing of this lawsuit—in the form of Statements of Performance, dated January 31, 2012." *Id.* (stating that the Tribe expressly agreed that those statements constituted 'accurate, full, true, and correct statements of all of [the Tribe]'s trust fund accounts as of the date of the Statements [January 31, 2012]").

The Tribe maintains that the Government's claims should be denied, as they are undeveloped and leave the court to guess at the arguments. Pl.'s Opp'n at 29 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)). The Tribe contends, nonetheless, that whether a tolling provision is currently in place in the ITAS is immaterial. Because the ITAS was in place at least as late as 2014, the issue is whether the six-year statute of limitations has expired since then.

The Tribe then maintains that the Government's repudiation claim is based on a misreading of *Wolfchild* and distinguishable in three ways. First, unlike the motion at hand, the claims in *Wolfchild* were not dismissed on a preliminary motion but addressed following a trial. Second, the Tribe explains that *Wolfchild* involved a challenge to a 1980 federal statute, providing that Congress was claiming that all right, title, and interests of the United States in land acquired under the 1898-1890 appropriations acts would be held in trust for Indian tribes. The Indian tribe in *Wolfchild* argued that the statute effectuated a taking of their land. Whereas in *Wolfchild* the United States was complying with a statute related to tribal lands and plaintiff had not timely challenged the statute, the Tribe argues that here the United States is violating the statute. Pl.'s Opp'n at 31. Third, it avers that the court concluded that because the *Wolfchild* plaintiffs were asserting that the 1980 Act effected a taking, their alleged damages accrued from that congressional act. *Id.* (contending that the Tribe's claims include damages that are currently accruing because of the United States' ongoing refusal to comply with the applicable act of Congress).

Regarding defendant's claim that an accounting was provided, the Tribe argues that the Government itself does not claim that those accounts should hold the money at

issue in this case. Therefore, the Tribe contends that the 2012 accounting would not bar the Tribe's claims related to the Government's taking of tribal funds.

The Tribe rightly points out that the ITAS' statute of limitation is to run six years from 2014, but it does not distinguish the ruling in *Wolfchild*. Whether the issue in *Wolfchild* was resolved through a preliminary motion or after trial is irrelevant, as this issue is purely one of law. Moreover, the Tribe's attempt to distinguish *Wolfchild* on its substance is without merit.

The Tribe does not contend sufficiently with the fact that the Government expressly repudiated any trust duties as late as 1986. The court in *Wolfchild* explained that the claims that are protected by the ITAS "are those for which an accounting matters in allowing a claimant to identify and prove the harm-causing act at issue." 731 F.3d at 1291. Where notice is given, as in this case through repudiation, "[applying] the ITAS would give claimants the right to wait for an accounting that they do not need." *Id.* Given the Government's repudiation, a final accounting was unnecessary to put the Tribe on notice. The Tribe's breach of trust claims are time barred. As such, it is unnecessary to resolve whether the 2012 Settlement Agreement precludes the Tribe's trust claims.

   3.  Taking Claim (Count 3)

The Tribe maintains that it is entitled to monetary damages resulting from the Government's unconstitutional taking of its land, natural resources, and proceeds. It claims that if the court agrees that the 1880 Act created recognized title, then the money the Government received from the land is the Tribe's. Pl.'s Opp'n at 1 ("While the Tribe lost its recognized title to lands disposed of under the public land laws, some of it has never been compensated for any lands disposed of after 1946. Further, the United States never sold the vast majority of the land. It continues to own that land. It continues to sell minerals from those lands."). However, the Government contends that the Tribe's taking claim is barred by the six-year limitation periods set forth in § 2501 and the Indian Claims Commission Act of 1946, Pub. L. No. 79-726, § 2, 60 Stat. 1049. Also, the taking claim is barred by the 1965 and the 2012 settlement agreements, according to defendant.

The Government's arguments to dismiss the Tribe's taking claim hinges on the view that the 1986 repudiation or opening of the lands to the public under the 1897 and 1948 acts effectuated a taking. The mere fact of opening lands to the public may not necessarily results in a taking in any event. *United States v. Pueblo of San Ildefonso*, 206 Ct. Cl. 649, 660 (1975) ("[E]ven if the aboriginal title areas of these pueblos were open to entry, it does not automatically follow that Indian title was destroyed prior to actual entries upon the various tracts of land. We know that the process of surveying lands and performing other deeds in anticipation of future white settlement does not itself affect

Indian title." (citing *Plamondon v. United States*, 199 Ct. Cl. 523, 528–29 (1972))). However, "[m]aking lands available for white settlement could, of course, in an appropriate factual context, constitute termination of aboriginal ownership." *Id.* The court explained that the "task of setting a date for the extinguishment of Indian title must be approached with certain fundamental principles in mind. The threshold rule, of course, is that termination of Indian title is exclusively the province of the United States." *Id.* at 655.

Moreover, unlike the Tribe's breach of trust claims, where the Government submitted authorities that supported its claim that trust obligations could be precluded through repudiation, it is not clear that such authorities lend equal support to the extinguishment of an Indian tribe's title. Congress' intention to extinguish an Indian tribe's title must be unambiguous and plain. *See United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 346, 354 (1941) ("[A]n extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards.").

Assuming the Tribe has recognized title to the Uncompahgre Reservation—a matter that remains unsettled since at least 1986—then the Tribe might have a legitimate claim to benefits from the lands that fall outside the scope of the settlements and within the statutory period. With this in mind, we examine the scope and effect of these acts and the settlement agreements to assess whether they preclude the Tribe's taking claim.

### A.   1965 and 2012 Settlement Agreements

#### i.   1965 Settlement Agreement

The Government maintains that the Tribe waived its taking claims in the 1965 and 2012 settlement agreements. It first points to the Tribe's 1951 Petition filed pursuant to the ICCA that resulted in the 1965 Settlement Agreement. Until the ICCA was enacted in 1946, Indian tribes could not litigate claims against the United States unless they obtained specific permission from Congress. It maintains that the ICCA was enacted to "dispose of the Indian claims problem with finality" and to "transfer from Congress to the Indian Claims Commission the responsibility for determining the merits of native American claims." Mot. Dismiss at 28 (quoting *United States v. Dann*, 470 U.S. 39, 45 (1985)).

The Government states that the Indian Claims Commission had exclusive authority for

> (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including

> those sounding in tort, with respect to which the claimant
> would have been entitled to sue in a court of the United States
> if the United States was subject to suit . . . .

*Id.* at 28 (quoting ICCA § 2, 60 Stat. 1049, 1050)); *see also* ICCA § 12, 60 Stat. at 1052 (stating that no claim existing prior to August 13, 1946, but not presented within five years, may thereafter be submitted to any court or entertained by Congress).

The Government maintains that the Tribe's 1951 Petition referred to the 1897 Act and alleged that the United States "opened to location and entry under the public land laws all lands in in the Uncompahgre Reservation . . . except lands actually allotted to Indians, and except that [the Government] retained title to certain minerals within any land so disposed of." Mot. Dismiss Ex. 4 at 5–6. It contends the Tribe sought to recover no less than the value of the original 1882 Uncompahgre Reservation area taken by the 1897 Act, consisting of at least 400,000 acres. Mot. Dismiss at 24 (stating that Tribe argued that the Government's taking left them without a promised reservation).

Defendant explains that the parties reached a settlement agreement in 1965, following years of litigation. The settlement provided that entry of the final order in the case will "finally dispose of all claims or demands which the [Tribe] has asserted or could have asserted against the [Government] in that case and [the Tribe] shall be barred from asserting all such claims or demands in any further action." Mot. Dismiss Ex. 4 at 4. The Government points out that the 1951 Petition sought *inter alia* compensation based on allegations that the United States "disposed of all lands in the Utah reservation for the Uncompahgre Utes as set forth in paragraphs 9 and 10 hereof without just compensation" and failed provide a reservation. Def.'s Reply at 10 (quoting 1951 Petition ¶ 11).

The Government point out that the Tribe was aware that it had lost beneficial interest in the Public Domain Lands. *Id.* To support this claim, the Government referred to the Secretary of Interior's 1935 letter to the Chairman of the Indian Business Committee, Uintah and Ouray Indian Agency, which stated that:

> As to the lands which originally comprised the former
> Uncompahgre Reservation, set apart by Executive Order of
> January 5, 1882, after allotments had been made to a number
> of individual members of this band, the remainder of the
> reservation was restored to the public domain under the Act
> of June 7, 1897 (30 Stat. 87). The lands so restored are not
> recognized as being of the class intended for restoration to

> tribal ownership under section 3 of the Act of June 18, 1934, mentioned above.

Mot. Dismiss Ex. 2 at 2.

The Tribe acknowledges that the 1965 Settlement Agreement settled claims regarding the small portion of surplus reservation lands the United States disposed-of to non-Indians between 1897 and 1946 (i.e., 400,000 acres out of the approximately 1,900,000 acres within the Uncompahgre Reservation). Plaintiff maintains, however, that the Agreement expressly excluded claims related to those lands precisely because it received compensation for them. "[The] Indian Claims Commission did not provide compensation for the larger part of the Uncompahgre that the United States had not taken and could not take without congressional approval." Pl.'s Surreply at 6–7 (stating that claims "regarding payment for surplus lands disposed of after 1946 were not settled by the 1965 Settlement Agreement).

The Tribe devotes much of its brief to arguing that the 1951 Petition was limited to the 400,000 acres and that the Government seeks to interpret a taking claim out of the petition's non-takings claims (i.e., the Government failed to provide an adequate reservation or maintain the reservation). Pl.'s Surreply at 6–7 ("[T]he Tribe's claim that the United States failed to maintain the Uncompahgre Reservation 'as a reservation for said Uncompahgre Utes,' is also not an oblique way of stating a takings claim for the other 1,500,000 acres. It is at most addresses the fact that the United States opened the Reservation, allowing non-Indians to enter and settle on land within the reservation.").[14]

On the issue of whether the 1965 Settlement Agreement covered the entire reservation or part of it, the Government states that:

> Indeed, pursuant to the 1965 Settlement Agreement, the Tribe has already been compensated for **those portions of the original 1882 Uncompahgre Reservation area** (including resources) allegedly taken by the United States following the opening of the Public Domain Lands in 1897 to non-Indian settlers.

---

[14] The 1965 Settlement Agreement states that, in its substance, the Tribe's claim is that defendant failed to provide the Uncompahgre Band with a reservation in Colorado or in Utah. Mot. Dismiss Ex. 5 at 1.

Mot. Dismiss at 25 (emphasis added). Defendant's statement reveals that it understood that the 1965 Settlement Agreement simply covered a portion of the original reservation, not the entire reservation. The language of the 1965 Settlement, whereby the Tribe was waiving all claims it had asserted or "could have asserted," confirms it waived any pre-1946 claim it might have had. It remains to be established, however, whether and to what extent, if any, the 1948 Act effectuated a taking. To the extent that the Tribe raises claims based on lands disposed of after 1946, those claims were not waived in the Settlement.

ii.    2012 Settlement Agreement

The Government also contends that the Tribe waived its taking claims in the 2012 Settlement Agreement. Pursuant to the 2012 Settlement Agreement, the Tribe waived *inter alia* all claims, regardless of legal theory, that related to the Government's management of the trust funds or non-monetary trust assets or resources. Mot. Dismiss Ex. 9 at 3. It emphasizes that the 2012 Settlement Agreement covered claims that it "improperly or inappropriately transferred, sold, encumbered, allotted, managed, or used [the Tribe]'s non-monetary trust assets or resources." Ex. 9 at 3. It argues that the alleged harm from the Tribe's taking claim fall within this broad waiver. The claims occurred in 1897, when the United States opened the Public Domain Lands to non-Indian settlement, or 1948, when the United States decided to maintain the public status of these lands.

Defendant argues that the Settlement waived claims (a) based on violations occurring before its execution (March 8, 2012) and (b) that relate to the Government's management or accounting of trust funds or non-monetary trust assets or resources:

The Tribe maintains that neither the 1897 nor the 1948 acts served to take the surplus reservation lands from the Tribe. The Tribe points to *Ute III*, where the Tenth Circuit Court of Appeals found that the 1894 and 1897 acts contained "no explicit language of cession, termination, or any other reference to 'the present and total surrender of all tribal interests,'" to the Uncompahgre Band's reservation lands. Pl.'s Opp'n at 16 (quoting *Ute III*, 773 F.2d at 1092) (citation omitted). The Tribe argues instead that the 1897 Act served to transform the unallotted reservation lands to surplus lands, a type of Indian lands that the United States holds while it disposes of the land for the economic benefit of a tribe. *Id.* (citing *Solem v. Bartlett*, 465 U.S. 463, 468 (1984)).

The Tribe contends that the 1948 Act did not create a taking. It explains that under the Act, Congress ordered the revocation of the 1933 order temporarily withdrawing the surplus reservation lands for a grazing reserve managed by the United States Grazing Service and Indian Affairs. Part of the land that had been within this reserve was placed

31

into Tribal trust status. The Bureau of Land Management (previously the U.S. Grazing Service), then took over sole management of the remaining lands. It argues that this managerial transfer of land did not and could not constitute a taking of the surplus reservation lands. Pl.'s Opp'n at 17 ("Nothing in this intradepartmental transfer severed the Tribe's remaining interest in the surplus lands. Notably, Defendant does not provide any support for how such a transfer could.").

The Tribe contends that regardless of how the status of the land is characterized, its suit is about money. It acknowledges that, pursuant to the 2012 Settlement Agreement, the United States paid the Tribe for some past violations. It argues, however, that the United States has an ongoing duty to comply with federal law. It contends that this duty requires it to pay the "Tribe for sales of minerals and other receipts for use of the land to which the Tribe had compensable title remains ongoing until the fee for that land is sold or until the Tribe's compensable title is bought out by the United States." *Id.* at 17–18.[15]

The language of the Settlement is framed broadly; however, its waiver relates "to the Government's management of the **trust funds** or non-monetary **trust** assets or resources." Ex. 9 at 3 (emphasis added). Although the Tribe has framed part of its claims in terms of trust assets or non-monetary trust assets, it argued that the claims also are premised on recognized title. These claims would be separate and independent of trust status. Because the scope of the 2012 Settlement is confined to trust funds or non-

---

[15] The Tribe asserts, moreover that:

> The United States, in its current motion, has not asserted and has not provided any basis upon which this Court could conclude, that if the Tribe's claims in this case are true, the money the United States has been pocketing should have been placed in any of those specific accounts that were at issue in the prior suit. For example, the United States has been receiving money from sales of oil from the disputed land, and apparently has been pocketing that money. But the United States does not claim in its current motion that any of the accounts at issue in the prior suit were the accounts into which the United States would deposit funds from the sale of land and resources within the Uncompahgre Reservation.

Pl.'s Opp'n at 19 (contending that the settlement was related to mismanagement of specific federal accounts held in trust for the Tribe, which were listed with specificity in attachments to that settlement).

monetary trust assets, the Tribe's claim that a taking of non-trust property has occurred arguably is outside the scope of the 2012 Settlement. We find that the 2012 Settlement does not bar the Tribe's claimed taking.

### B.  Statute of Limitations: § 2501 and the ICCA

The Government contends that the Tribe's taking claims are barred under § 2501 and the ICCA because they "likely accrued in 1897 or 1948, and certainly no later than 1986." Mot. Dismiss at 26. Defendant maintains that the Tribe's taking claim was not brought within six years from the date it learned the Public Domain Lands were not being held for its benefit. Moreover, since the 1897 Act, when the original 1882 Uncompahgre Reservation was first opened, several events show that the Tribe was or should have been aware of the alleged taking. *Id.* at 27–28 ("More than that, the Tribe has manifested its knowledge that the Public Domain Lands are not held in trust through its own affirmative actions (i.e. the Tribe's 1934 and 1938 petitions for restoration, the 1951 Petition, and the 1965 Settlement Agreement).").

Section 2501 states that a claim must be filed within six years after such claim first accrues. A plaintiff's claims accrue "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1350 (Fed. Cir. 2011) (citation omitted). Similarly, under the ICCA, pre-1946 claims against the United States not brought before the Indian Claims Commission by 1951 were barred. *Sioux Tribe v. United States*, 500 F.2d 458, 489 (Ct. Cl. 1974) (citing ICCA, 60 Stat. at 1052).

Based on the historical background and arguments filed by the parties, it is unclear that the 1897 and the 1948 acts effectuated a taking. Given this uncertainty, we cannot confirm when the alleged taking accrued and therefore whether it is barred by § 2501. Indeed, the Tribe alleged that the Government conducted an oil and gas lease sale in 2017. If the 1897 Act did not result in a taking, those are not claims that the Tribe could have asserted under the ICCA. *See Pueblo of San Ildefonso*, 206 Ct. Cl. at 656 (stating that the date of a taking "depends upon the particular facts, circumstances and history of each case"). We must rule that the Government's statute of limitations claims be denied at present.

### CONCLUSION

The Government's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The ruling denying the motion to dismiss rests on the contested premise that the Tribe holds "recognized title to the Uncompahgre Reservation." The Government has not

yet expressly challenged this premise, however.[16] An opportunity to rule on the soundness of this premise would facilitate resolution of this case.

      The Government's motion to dismiss the Tribe's trust claim (Count 1) and violation of the 1880, 1894, and 1897 acts claim (Count 2) is **GRANTED**. Its summary judgment motion to dismiss Count 1 and Count 2, pursuant to the 2012 Settlement Agreement is therefore **DENIED** as moot.

      The Government's motion to dismiss the Tribe's taking claim (Count 3), pursuant to § 2501 and the ICCA, is **DENIED**, as it is unclear when the alleged taking occurred. Its summary judgment motion to dismiss the Tribe's taking claim, pursuant to the 1965 and 2012 settlement agreements, is **DENIED.** Judgment on plaintiff's accounting claims (Count 4 & 5) is **RESERVED**.[17]

      **IT IS SO ORDERED.**

s/*Robert H. Hodges, Jr.*

Robert H. Hodges, Jr.
Senior Judge

---

[16] In the Tribe's District of Columbia proceedings, the Tribe "seeks to quiet title to the lands within the exterior boundaries of the Uncompahgre Reservation that the United States currently holds title to but does not recognize as land held in trust for the benefit of the Tribe." Mot. Dismiss Ex. 1 at 28, 29 (contending that "there is no applicable statute of limitations or the Tribe's claim is brought within the applicable statute of limitations for a quiet title claim").

[17] This court lacks jurisdiction to provide declaratory and injunctive relief, but we may order an accounting in aid of judgment if the Tribe establishes a taking (Count 3). *See James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (explaining that "the Court of Federal Claims has no power to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment" (internal quotation marks omitted)).